UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

    v.                                             **23-CR-143-JLS**

AUGUSTO MATEO-FRANCISCO,

                    Defendant.
_____

## SENTENCING MEMORANDUM

### INTRODUCTION

I represent the defendant, Augusto Mateo-Francisco, in the above-captioned case. I submit this Memorandum in Aid of Sentencing in support of Mr. Mateo-Francisco's request for a sentence that is sufficient, but not greater than necessary.

### PROCEDURAL HISTORY

Mr. Mateo-Francisco was charged by indictment with two counts of forced labor in violation of 18 U.S.C. § 1589(a), one count of kidnapping of a minor in violation of 18 U.S.C. § 1201(a) and (g), and one count of transportation of a minor in violation of 18 U.S.C. § 2423(a) and (e). Dkt. 1. When proceedings began here, Mr. Mateo-Francisco had a pending case in (and was detained in) the Northern District of New York. Dkt. 30 at ¶ 85.

Following that case's conclusion, Mr. Mateo-Francisco was moved to the Western District of New York.

After several adjournments, the parties entered into a plea agreement. Dkt. 27. Mr. Mateo-Francisco pleaded guilty to counts 1, 2, and 4. *Id*. at ¶ 1. The parties calculated the guideline

sentence as 188 to 235 months. *Id*. at 21. In that plea agreement, the parties agreed to an Fed. R. Crim. P. 11(c)(1)(C) range of 180 to 360 months. *Id*. at 22.

The Presentence Report calculated a higher recommended sentence. Based on a USSG § 4B1.4(b)(1), the PSR calculated the recommended sentence as 324-405 months. Neither party objected to the PSR. The case is now before the Court for sentencing.

## **SENTENCING FACTORS**

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that the United States Sentencing Guidelines ("USSG") were no longer mandatory. Although the Court must still properly calculate and consider the advisory Guidelines range, the Court may not presume this advisory range is reasonable and need only give this range fair consideration before imposing a sentence. *United States v. Jones*, 531 F.3d 163, 170 (2d Cir. 2008). The advisory Guidelines range now serves as merely an initial benchmark for sentencing, which is ultimately considered along with other 18 U.S.C. § 3553(a) factors. *See Rita v. United States*, 551 U.S. 338 (2007); *Kimbrough v. United States*, 552 U.S. 85 (2007); *Gall v. United States*, 552 U.S. 38 (2007). The section 3553(a) factors include: the characteristics of the offender and offense; the need for the sentence imposed; the legally available sentences; applicable policy statements of the Sentencing Commission; the need to avoid unwarranted sentencing disparity; and the need to provide restitution, where applicable. Section 3553(a) mandates that any sentence imposed be sufficient, but not greater than necessary to meet the basic goals of sentencing including retribution, deterrence, incapacitation, and rehabilitation.

In *Gall*, the Supreme Court made clear that sentencing courts have great discretion in formulating appropriate sentences. *Gall*, 552 U.S. at 51 (recognizing that the sentencing judge is

in the "superior position" to impose a sentence based on the unique facts and circumstances of the case). "[I]n the end, [the Court] must make an 'individualized assessment' of the sentence warranted by § 3553(a) 'based on the facts presented.'" *Jones*, 531 F.3d at 170 (quoting *Gall*, 552 U.S. at 50). In determining an appropriate sentence, 18 U.S.C. § 3553 mandates the Court to impose a sentence that is "sufficient, but not greater than necessary." Therefore, if the district court concludes that either of two sentences would properly serve the statutory purposes of § 3553(a), the lesser sentence must be imposed. *United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2d Cir. 2006).

## ARGUMENT

Mr. Mateo-Francisco respectfully requests that the Court adopt the plea agreement and impose a sentence within the Fed. R. Crim. P. 11(c)(1)(C) range. *See* Dkt. 27 at ¶ 22. Specifically, Mr. Mateo-Francisco respectfully requests that the Court impose at 180-month sentence. Given Mr. Mateo-Francisco's characteristics and history, that sentence is sufficient, but not greater than necessary, to meet the sentence's purposes.

A 180-month sentence is a significant and meaningful sanction. Mr. Mateo-Francisco will have been incarcerated from his early 30s until he is almost 50. Dkt. 30 at 1-2. He will spend multiple stages of his life behind bars and miss milestones with his loved ones. It is instantly understandable as a serious sentence especially given his lack of serious criminal history. Prior to his detention on this case, he only had a DWAI conviction and harassment violation, neither of which resulted in jail time. Dkt, 30 at ¶¶ 83-84. The case that resolved while this case was pending resulted in a time-served sentence. *Id*. at ¶ 85. A 180-month sentence sends a message that crimes like this will not be tolerated and will discourage other people from committing similar crimes. It "reflects the seriousness of the offense[s]." 18 U.S.C. § 3553(a)(2)(A).

Mr. Mateo-Francisco's history and circumstances also favor this sentence. He was born in and spent the first part of his life in Huehuetenango, Guatemala. Dkt. 30 at ¶ 111. This is a largely rural province in Western Guatemala. Bermeo et al, *Rural poverty, climate change, and family migration from Guatemala*, Brookings Institution (April 4, 2022), available at: https://www.brookings.edu/articles/rural-poverty-climate-change-and-family-migration-from-guatemala/#:~:text=The%20three%20departments%20with%20the,of%20high%20likelihood%20of%20drought.



Almost three-quarters of the population in Huehuetenango lives in poverty and more than one-quarter cannot read. MPI at 13. Within the rural population of Guatemala generally, 76 percent

---

[1] Selee et al, *Migration from Huehuetenango in Guatemala's Wester Highlands: Policy and Development Responses*, at 4 Migration Policy Institution; USAID (March 2022), available at https://www.migrationpolicy.org/sites/default/files/publications/mpi-huehuetenango-report-eng_final.pdf (hereinafter "MPI")

live in poverty and 36 percent live in extreme poverty. MPI at 14. Food is often scarce in the western highlands, with 68 percent of children in Huehuetenango experiencing food insecurity. Unsurprisingly, education is also poor. On average, rural Guatemalans over 15-years-old have 3.9 years of education. MPI at 16.

Life is even harder for people of indigenous descent, like Mr. Mateo-Francisco. Dkt, 30 at ¶ 113. As of 2014, approximately 80 percent lived in poverty and about 50 percent in extreme poverty. Solving these problems remains difficult because indigenous people find them functionally excluded from national government and many economic opportunities. MPI at 14.

These difficulties defined Mr. Mateo-Francisco's childhood. Both of his parents were farmers. Dkt. 30 at ¶ 113. He lived in extreme poverty and frequently went without basic needs, such as clothing, food, and water. *Id*.

Education was similarly lacking. He did not receive any formal education throughout his life. Dkt. 30 at ¶ 122. Although able to speak Spanish fluently, he never learned to read or write the language. *Id*.

Instead, of education, his father took him to work. If Mr. Mateo-Francisco did not go to work with his father, he would be physically punished. Dkt. 33 at ¶ 14. Mr. Mateo-Francisco also described experiencing sexual abuse. During his childhood, a person attempted to sexually assault him. Ultimately, his brother intervened and stopped the assault. Dkt. 30 at ¶ 117.

Mr. Francisco understandably wanted to leave this behind. He left Guatemala at age 15— after having lacked basic necessities, received no formal education, and been subject to punishment if he did not work the farm with his father. He came to the United States and almost soon arrived in the Western New York area, specifically in Dunkirk. Once in Dunkirk, he began working at various farms and vineyards almost immediately. He was frequently paid under-the-table, and

5

farmers had no issues hiring him (and other people) when he might have left identification at home. They simply paid cash at the end of the week, typically below minimum wage.

Echoes of Mr. Mateo-Francisco's past can be seen in these offenses. He grew up lacking basic necessities. He grew up in a family in which the decision whether to work did not belong to him, and his father enforced that decision with physical punishment. He grew up learning that working in the farms took priority over education.

Parts of that did not change when he moved to the United States. He did not catch upon his missing education. He did not receive formal schooling or learn to read and write English. We would have hoped our society would have seen the short comings and sought to correct them. But he immediately resumed working in the fields. He also worked in an industry—the farms and vineyards in Southwest New York and Northwest Pennsylvania—that frequently turned a blind eye to the laws surrounding immigration and employment for their own profit. As recently as last December 2024, Wine Business—the leading producer of information and events for the wine industry—published an article entitled "What to Do When ICE Comes to Your Vineyard—that advised vineyard owners to maintain a "Don't Ask, Don't Tell" attitude about the immigration status of their workers to ensure deniability and to consider outsourcing labor to third-party companies as another source of deniability. W. Blake Gray, *What to Do When ICE Comes to Your Vineyard*, Wine Business (Dec. 2, 2024), available at https://www.winebusiness.com/news/article/295716. Rather that correct Mr. Mateo-Francisco's past and upbringing, people sought to capitalize on them.

These trends do not absolve Mr. Mateo-Francisco or justify his actions. Rather, they provide context and information. Mr. Mateo-Francisco did not commit these actions in a vacuum

and out of an intrinsic criminality. Broader trends and incentives, combined with the lack of alternative opportunities, also repeatedly pushed him toward these decisions.

While many of his past actions showed a disregard for the law, other aspects show that he can act within the law's confines. As an immigrant, he eventually was able to achieve legal status. He is currently a legal permanent resident. Dkt. 30 at 2. While Mr. Mateo-Francisco serves his prison sentence, he knows that he will need to work to rebuild the person who was willing to do that. He is willing to do that work.

Mr. Mateo-Francisco also has been in a long-term and stable relationship with Maribel Ramirez, his girlfriend of 11-years. Dkt. 30 at ¶ 115. The couple shares a child and also raises Mr. Mateo-Francisco's child from another relationship. *Id*. Mr. Mateo-Francisco talks frequently about these relationships and their importance. His family has also reached out consistently for updates on his case.

His life in the United States—including his legal status, partner, and children—also show what these convictions will cost him. Following his prison sentence, he will be deported. His relationship with Maribel will end. He will have little, if any, contact with the children he was raising with Maribel. He will return to a country that he fled from because of impoverished conditions. He will lose out on the economic opportunities that a legitimate life in the United States could have provided. This loss is a punishment beyond the prison.

This deportation also impacts the need for the sentence to deter him from any future crimes and incapacitate him. *See* 18 U.S.C. § 3553(a)(2)(B)-(C). A longer sentence is not necessary to achieve these goals because his deportation will further these goals, as Mr. Mateo-Francisco will also not be released back into this country. A 180-month sentence will allow the criminal justice

system and immigration system to work together to achieve their respective goals without imposing additional burdens on our prison system.

Mr. Mateo-Francisco regrets the actions that he took, and he has accepted responsibility by pleading guilty to the offense. For the reasons discussed above, he respectfully requests that the Court adopt the plea agreement and impose a 180-month sentence.

**DATED**:             Buffalo, New York, August 11, 2025.

                                        Respectfully submitted,

                                        **/s/  John J. Morrissey**
                                        John J. Morrissey
                                        Assistant Federal Public Defender
                                        Federal Public Defender's Office
                                        300 Pearl Street, Suite 200
                                        Buffalo, New York 14202
                                        (716) 551-3341, (716) 551-3346 (Fax)
                                        John_Morrissey@fd.org
                                        Counsel for Defendant Augusto Mateo Francisco


**TO:**    Douglas A.C. Penrose
           Assistant United States Attorney